UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**BENJAMIN McWATERS,**

    **Plaintiff,**

**v.**                                                  **CASE NO.: 5:24-cv-218-AW-MJF**

**CITY OF LYNN HAVEN,**

    **Defendant.**

_____/

## AMENDED COMPLAINT

Plaintiff, BENJAMIN MCWATERS, hereby sues Defendant, CITY OF LYNN HAVEN, and alleges:

## NATURE OF THE ACTION

1. This is an action brought under 42 U.S.C. §12101 et seq.

2. This action involves claims which are, individually, in excess of Fifty Thousand Dollars ($50,000.00), exclusive of costs and interest. This case was removed to this Court by the Defendant.

## THE PARTIES

3. At all times pertinent hereto, Plaintiff, BENJAMIN MCWATERS, has been a resident of the State of Florida and was employed by Defendant. Plaintiff is a member of a protected class due to his disability.

4. At all times pertinent hereto, Defendant, CITY OF LYNN HAVEN, has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5. Plaintiff has satisfied all conditions precedent to bringing this action, if any.

## STATEMENT OF THE ULTIMATE FACTS

6. Plaintiff, a disabled male, began his employment with Defendant on June 22, 2006, and held the position of Firefighter/ Emergency Medical Technician (EMT)/ Fire Inspector at the time of his constructive termination on April 14, 2023.

7. Despite his stellar work performance during his employment with Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of his disability.

8. The disparate treatment and retaliation came at the hands of specifically, but not limited to Fire Chief John DeLonjay, Assistant Fire Chief Darrell Hernandez, and Captain Ivey Walker.

9. Plaintiff suffers from disabling conditions, to wit: dyslexia, learning disability, anxiety, and obsessive-compulsive disorder, of which Defendant was aware.

10. Plaintiff was a loyal and dedicated employee. Plaintiff always received favorable evaluations that stated "exceeds expectations". In 2008, Plaintiff was awarded with "Firefighter of the year". Hernandez told Plaintiff he trusted him with his life and said he was "a damn good hard worker".

11. Throughout Plaintiff's employment he was required to work for extended periods of time performing leadership duties, but Plaintiff was never promoted to a leadership role nor compensated for his leadership duties.

## BACKGROUND

12. By way of example, Senior Firefighter Bobby Mayo decided to attend EMT School. During this time Plaintiff was in charge of Station 2 on October 1, 21, 24, 27 and 30, 2015, and December 11 and 20, 2015, all of February 2016, April 3, 9, 12, 15, 24, 2016, May 15, 24, 27-31, 2016, April 1-2, 2016 and from May 27, 2016, through April 2, 2018, so Senior Firefighter Bobby Mayo could attend and complete EMT school. On September 9, 2022, Captain Walker was written up, suspended and demoted from Captain to Lieutenant and Plaintiff was put in charge of Station 2 as "acting Lieutenant" to make all decisions from September 9, 2022, through March 26, 2023.

13. However, even though Plaintiff was in charge of Station 2, Plaintiff had

a very low salary that was almost equivalent to a rookie Fire Fighters' salary despite the fact that Plaintiff had an Associate's degree, EMT, Fire Inspector, Fire Officer 1, Pump Operator Certifications and had worked for Defendant since 2006.

14. Throughout Plaintiff's employment he has been treated less favorably than co-workers outside his protected class including but not limited to Firefighters: Paul Eggermann, Troy Dvoy, Willie Walker, Bobby Mayo, Sam Smith, Ronald Lamarre, and David Rafuse.

15. By way of example, Plaintiff never received a Lifesaving medal despite the fact that he had administered CPR and revived/saved the lives of several patients. Firefighter Jerry Kessinger, and Captain Ivy Walker, received lifesaving medals when they administered CPR.

16. Firefighter Brandi Kelly was given easier training and had easier job assignments than Plaintiff but made more money.

17. Plaintiff was also not reimbursed by Defendant for renewing his EMT certification nor for his Fire Inspector and Fire Instructor Certifications. However, Defendant reimbursed Austin Holgerson for his class for certification.

18. Captain Samuel Smith also received his accommodations for SCBA glasses right away while Plaintiff had to wait over a year to receive his accommodations.

19. On February 12, 2013, Eggermann was promoted to Senior Firefighter despite the fact that Plaintiff has more experience. At that time, Plaintiff also had an Associate's degree in Fire Science Technology, was a Fire Inspector, Fire Instructor, Fire Officer 1 and Pump Operator, while Eggermann had none of these qualifications.

20. In February 2014, Troy Dvoy was promoted to Senior Firefighter while Plaintiff was better qualified as shown by his qualifications, while Dvoy had none of these qualifications.

21. On October 2, 2014, Willie Walker was promoted to Senior Firefighter although Plaintiff was better qualified. Plaintiff had more experience than Walker who had none of the qualifications Plaintiff had.

22. On March 2, 2016, Bobby Mayo and Sam Smith were promoted to Senior Firefighter. Plaintiff was better qualified and had more experience while Mayo and Smith had none of the qualifications Plaintiff had.

23. On June 21, 2018, Ronald Lamarre was promoted to Fire Inspector. Plaintiff was better qualified. Lamarre was bereft of the qualifications that Plaintiff had.

24. On December 1, 2018, Plaintiff submitted a leave request to be off for 24 hours for PTO on December 28, 2018. Plaintiff's request was not approved but other employees' requests were approved.

25. On June 2, 2019, Plaintiff and Firefighter David Rafuse responded to a medical call. Plaintiff put on his knee pads to kneel on pavement and obtain patients' vitals. On the way back to the station, Rafuse threatened Plaintiff and said if he wore his knee pads again on a call he would punch Plaintiff. Once at the station Rafuse reported to Mayo that Plaintiff wore knee pads on a call. Rafuse told Captain Chase Curti that Plaintiff wore knee pads. Plaintiff reported to Curti that Rafuse had threatened to punch him. Curti replied to Plaintiff and said he didn't want to hear about it.

26. On October 28, 2019, Plaintiff presented Defendant with his doctor's note requesting for him to be put on a different shift due to Plaintiff's disabilities. By that time, Plaintiff was being harassed and bullied by Rafuse which compounded Plaintiff's illnesses. Plaintiff's shift change was not approved until February 1, 2020 which exacerbated Plaintiff's conditions.

27. On or about June 3, 2019, Hernandez questioned Plaintiff about wearing knee pads on a call. Hernandez ordered Plaintiff to put his knee pads in the truck and to never wear them at the station again. Plaintiff asked if he could wear the knee pads while they laid tile on the floor of the station but Hernandez told Plaintiff he lost that privilege. Plaintiff was using the knee pads to prevent injury to his knees. Plaintiff even had a doctor's note which he had provided to Defendant which said he needed to wear his knee pads.

28. On October 28, 2021, Robert Landon was promoted to Lieutenant. Plaintiff was more qualified for the position. Landon was devoid of the qualifications that Plaintiff had.

29. In Fall 2021, Plaintiff asked Captain Dan Kenny why he did not receive the promotion to Lieutenant and why Landon was selected for the promotion when Plaintiff was more qualified. Kenny said that per DeLonjay Plaintiff was not promoted because of "his mental thinking and learning disability".

30. On February 5, 2022, Plaintiff had to perform hydrants maintenance work while it rained and was 41 degrees outside. However, Kelly sat at the station and watched football and did not have to assist Plaintiff.

**CLAIMS FOR WHICH RECOVERY IS SOUGHT IN THIS CASE**

31. After Plaintiff endured being passed over for approximately eight (8) positions, on or around February 2023, Chief DeLonjay sent out an email that the permanent Lieutenant position would be filled. At the time, Plaintiff was already serving in the Acting Lieutenant position as he had been since September 2022 through March 26, 2023.

32. While serving as Acting Lieutenant, Plaintiff responded to Chief DeLonjay and expressed an interest in applying for the permanent Lieutenant position. Because of Plaintiff's anxiety, he wanted to ensure he was prepared for the interview. Plaintiff asked the Chief if there were any pointers or suggestions that he

could provide to assist him in preparing for the interview. The Chief did not provide any feedback.

33. Plaintiff was interviewed for the position; however, on March 6, 2023, he learned that he was not hired as the successful candidate and another employee James McDougall was promoted to the Lieutenant position.

34. Plaintiff was more qualified for the position as he had served in an Acting role on several occasions and currently held the position. Plaintiff possessed the educational requirements, certification and years of experience. On the other hand, at the time, McDougall did not have the educational requirements or years of experience.

35. In fact, in order to promote McDougall, Chief DeLonjay used the job description from the City of St. Petersburg, Florida to tailor the job for McDougall, Chief DeLonjay then deleted the educational requirements from the original position description for the lieutenant position and reduced the number of years of experience from six (6) years to five (5) years—the exact number of years to permit McDougall to qualify for the position. Plaintiff had met the job requirements for the original position.

36. In addition, after the interview process, Plaintiff attempted to gain feedback to determine how he could have been the successful candidate. Plaintiff once again asked the Chief, but did not receive any feedback. Plaintiff then spoke

with Captain Joseph Bayba who provided a few tips. Bayba then told Plaintiff that the Chief would conduct a post interview critique to discuss ways to improve during interviews. Plaintiff never received a post interview critique. Chief DeLonjay met with other non-disabled employees who applied for the Lieutenant position to provide feedback and critique their interview skills, i.e. Gerald Kessinger, Ryan Thornton, and David Rafuse, all non-disabled employees. Plaintiff asked the three employees if this was indeed the case and they all stated yes, indicating they received feedback from Chief DeLonjay.

37. On or about March 15, 2023, Plaintiff had become emotionally distraught over the discriminatory treatment and the failure to promote him to the Lieutenant position. Plaintiff visited his primary care physician as he could no longer endure the workplace stress, which triggered his anxiety, depression, sleeplessness, and issues with his vision.

38. On or about March 17, 2023, Plaintiff spoke with Captain Smith about the interview process. Smith stated that three individuals assisted in making the hiring decision – Human Resources and two Chiefs outside of the fire department. Plaintiff was told that he was the best dressed and the highest qualified, but according to Chief Walker, if Plaintiff interviewed better he may have gotten the promotion. Plaintiff understood that due to his disability, his interview questions may not have been presented in the same manner as non-disabled candidates. However, staff was

fully aware of Plaintiff's disability and that due to his dyslexia, he writes information on a notepad and/or may repeat questions back to ensure he understood the questions.

39. In addition, Plaintiff's need to write down information was often misunderstood as a communication issue; however, Plaintiff communicated well and had already been serving in the lieutenant position without criticism or issue. Plaintiff was also told directly that if the promotional test was more based on fire ground scenarios with more physical hands on decision making then the position would have been in his favor. Plaintiff understood that Defendant refused to promote him based on his diagnosed learning disability, because Defendant said that jobs with physical requirements or hands on tasks were alleged to have been more suitable for his skills.

40. After March 17, 2023 through March 26, 2023, Plaintiff performed tasks that as a Lieutenant, he would have properly performed. By way of example, on March 20, 2023, at Station 2, Plaintiff reviewed Station 2's crew timesheets (James and Pitts) and turned them in to Captain Smith who then turned them in to Tracy Johnson, the Administrative Assistant who processed timesheets.

41. Later in the day on March 20, 2023, at 3:00 pm during a training session at Station 2, Captain Smith forgot the Station one crew's time sheets. The crew was required to leave early from training to go to Station one to allow everyone could complete their own time sheets and turn them into Tracy Johnson. This reflected

poor management skills and a lack of time management, as Plaintiff would have completed all time sheets as he had voluntary completed for Station 2's crew.

42. Thereafter, Plaintiff continued to work his shift as best as possible. However, on March 23, 2023, Plaintiff became even more emotionally distraught and faced severe depression as the very tasks that other staff should have been able to perform, Plaintiff was required to perform.

43. By way of example, on March 26, 2023, while at Mosley High School, newly promoted McDougall was not aware of how to properly set up a cone course in a straight line. Plaintiff was required to demonstrate how to do so and make corrections.

44. On March 28, 2023, Plaintiff visited his primary care physician once again to seek medical attention for increasing stress and severe depression of performing tasks for a non-disabled employee, McDougall, who was hired in the position for which he was fully qualified.

45. On March 29, 2023, Plaintiff became ill, emotionally crippled, depressed, and was unable to arrive at work. Plaintiff began to feel that he could no longer continue with the struggles, stress and abuse in the workplace. Plaintiff was resourceful only to benefit Defendant, while being the lowest paid firefighter who would likely never be promoted. As noted below, this all became a reality when Plaintiff learned that indeed he would have likely never been promoted while in the

employ of Defendant and would have never been considered for a promotional opportunity.

46. On March 30, 2023, Plaintiff met with his counselor, Melanie Spoon, LSW, who stated that Plaintiff was no longer able to continue working under the conditions with Defendant. Ms. Spoon also indicated that as of March 30, 2023, based on the conditions in the work environment, Plaintiff was not fit for duty.

47. Plaintiff's physician also told him that he may want to start looking for another job.

48. The following day, on March 30, 2023, Plaintiff accepted this professional advice and had no other choice but to meet with Chief DeLonjay to discuss the need to leave the Lynn Haven Fire Department for his health and mental stability.

49. Plaintiff initially provided a two week-notice with an official last day of April 14, 2023. In response, Chief DeLonjay told Plaintiff that he had enough personal time to take a month off, clear his head and come back to work. Plaintiff told Chief DeLonjay that he had given this much thought and he had to place his health at the forefront of his decision making.

50. Plaintiff could not endure working in the stressful environment for another day and could not physically remain until April 14, 2023, departing on March 30, 2023.

51. Under these circumstances, no reasonable person would remain in the employ of Defendant. Plaintiff was emotionally and physically unable to continue working for Defendant when he was constructively terminated from the Firefighter position and after having just proven himself in the role as Acting Lieutenant, but not offered the permanent role.

### Events After Plaintiff's Constructive Termination

52. On or about April 6, 2023, Plaintiff spoke with Commissioner Brandon Aldridge who revealed that the Lieutenant position for which Plaintiff applied had been approved two months prior to the interview process. Aldridge also stated that Defendant actually waited for McDougall to attain five years of experience so that he could be qualified for the position.

53. As previously mentioned, the original posting from the St. Petersburg position required six years, which Plaintiff had, but as confirmed by Aldridge, McDougall, a non-disabled employee was groomed for the position.

54. Aldridge also scheduled a meeting with the Chief DeLonjay and the City Manager Vickie Gainer to discuss the unfairness of promotional opportunities for which Plaintiff applied and never received. When Aldridge asked the Chief why Plaintiff was not considered for the position as Lieutenant, had more experience and was the most qualified, Chief DeLonjay only stated he would get back with Aldridge on that matter.

55. After departing from Defendant, Plaintiff continued to face severe depression and anxiety, sleepless nights, memory loss, vision issues, worry, stress, dizziness, inability to focus, and a myriad of other symptoms that were consistent with a nervous breakdown from not having a clear understanding of the discriminatory treatment he faced in the workplace.

56. Approximately April 25, 2023, Plaintiff managed to secure employment with the U.S. postal service however, he often delivered mail in Lynn Haven and to the Lynn Haven city offices, which only triggered the emotional trauma he endured. As Plaintiff continued in this role, he realized he could no longer work under conditions requiring him to return to Lynn Haven city offices.

57. On the same day of April 25, 2023, Plaintiff met with his counselor. He also spoke to a psychiatrist who recommended medication to control the anxiety and depression. Plaintiff's primary physician thereafter prescribed medications as treatment. While under doctor's care, Plaintiff worked with the postal service until June 22, 2023 after which the anxiety and depression took its toll causing Plaintiff to seek time off and ultimately resulted in his constructive termination.

58. As of July 31, 2023, Plaintiff obtained additional employment as a Safety Director. Plaintiff continued to face anxiety, stress, vision issues, depression, and other stress related symptoms; however, he had no direct contact with and no requirement to work in a capacity that required a visit to any of Defendant's offices.

59. Approximately April 6, 2024, Plaintiff contacted Captain Walker to

speak with him about the issues Plaintiff faced during his tenure with Defendant. Walker was blatantly transparent about what was stated said during a discussion with the officers and chiefs as they mentioned that Plaintiff would never have been a part of their group—as an Officer or Lieutenant, all of whom were non-disabled. Walker also indicated that staff never took time to invest and train Plaintiff as they did with other employees who were promoted. Those promoted were non-disabled individuals.

60. During a meeting with the Chiefs, Walker noted there would be negative reactions from Chief DeLonjay when it was stated Plaintiff was a great candidate for Lieutenant. Walker admitted that Plaintiff was held to different standards from other employees within the workplace

61. By way of example, Defendant would only use Plaintiff to train new firefighters, but they would never place him in a position of Lieutenant or offer him a higher title even when using his expertise to fulfill the duties of the Lieutenant position.

62. Moreover, Captain Walker compared Plaintiff to a victim of spousal abuse because Defendant kept beating him down and would continue to beat him down as long as he remained quiet.

63. In the end, the emotional abuse and exacerbation of stress, anxiety and depression caused by the discriminatory treatment caused Plaintiff severe distress

that triggered his well-known and perceived disabling conditions—those that Defendant's employees used as a target by questioning why he wrote things down, why he communicated with patients in the manner in which he did and questioned why he used certain words when speaking—all disabling conditions that did not prohibit Plaintiff from performing in an Acting role of Lieutenant, but after seventeen years of loyal service to Defendant, Plaintiff's disabilities caused mockery. Plaintiff's disabilities would not allow Defendant to appoint him to a permanent Lieutenant position or any other promotional opportunity.

64. On the other hand, when Captain Walker, a non-disabled employee resigned, City Manager Gainer attempted to persuade Walker to continue working with Defendant for two additional years in exchange for the promise of appointing him as Fire Chief after DeLonjay retired. No consideration was given to Plaintiff's qualifications and experience that he already possessed after working with Defendant for seventeen years.

65. No reasonable person would remain in the employ of Defendant under these circumstances. Plaintiff was emotionally and physically unable to continue working for Defendant when he was constructively terminated on March 30, 2023, with an official date of April 14, 2023.

66. Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services. Defendant should be made to

pay said fee under the laws referenced above.

## COUNT I
## DISABILITY DISCRIMINATION

67. Paragraphs 1 through 66 are realleged and incorporated herein by reference.

68. This is an action against Defendant for disability discrimination.

69. Plaintiff has been the victim of discrimination on the basis of his disability or perceived disability. During the course of Plaintiff's employment with Defendant, he was treated differently than similarly situated nondisabled/perceived-as-disabled employees.

70. Defendant is liable for the differential treatment and its refusal to and delay in accommodating Plaintiff, as well as its failure to engage in the interactive process with Plaintiff which adversely affected the terms and conditions of Plaintiff's employment with Defendant. Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

71. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were disability/perceived-disability based and in violation of the laws set forth herein.

72. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant. The events set forth herein lead, at least in part, to Plaintiff's constructive termination.

73. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon disability or perceived disability or his record of having an impairment under the laws enumerated herein.

74. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing. Plaintiff is entitled to injunctive/equitable relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a) that process issue and this Court take jurisdiction over this case;

(b) that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's

    obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)  enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)  enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)  enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)  award Plaintiff interest where appropriate; and

(g)  grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

[*The remainder of this page intentionally left blank.*]

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,

*/s/ Farnita Saunders Hill*
**FARNITA SAUNDERS HILL, ESQ.**
Florida Bar No. [1012158]
**MARIE A. MATTOX P.A.**
203 North Gadsden Street
Tallahassee, FL 32301
Telephone: (850) 383-4800
Primary Email: Farnita@MattoxLaw.com
Secondary Email: Rachel.Spencer@MattoxLaw.com
Scheduling: Michelle2@MattoxLaw.com
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Court's CM/ECF electronic filing system, which will send notice to all counsel of record on this 18th day of October 2024.

*/s/ Farnita Saunders Hill*
Farnita Saunders Hill